GRAFTON, JUNE, 1882.

---

SANBORN v. SANBORN & a.

A testator's intention, proved by competent evidence, is his will. In one sense, his intention, like the meaning of a written contract, statute, or constitution, is a matter of law: it is a question for the court. In another sense it is a matter of fact: it is to be determined by the natural weight of legal proof, and not by technical rules of construction introduced by a judicial exercise of legislative power.

A life estate, expressly devised, is not enlarged into a fee by a habendum to the life tenant " and his heirs," or by a clause making him residuary devisee, when the whole will, taken together, shows that the testator intended to carve out a life estate, and to give the remainder expectant thereon to the persons described as " heirs."

BILL IN EQUITY, by the widow of David P. Sanborn, against their children, for a construction of his will, and for a decree to carry it into effect.   Facts found by a referee.

[COPY OF THE WILL.]

In the Name of God Amen

I. David P Sanborn

of Littleton in the County of Grafton and State of Newhampshire being week in body but of a Sound
mind &
and perfect ʋ memory. which I have reason to praise God do make publish and declare this my last, will and testament and herein despose of all my worldly Estate in mnaur following to wit

first. I order and direct my Executor herein named
  to pay all my Just debts and funeral charges
  Soon as may be after my deceased

Naomi
Second I, give and bequeath to my beloved Wife ⎡Naomi
  H, Sanborn all my House hold furnetur
  also give and devise to my beloved Wife for
  and during the term of her natural life the
  homestead place where we now occupy in said
  Littleton containig about One half acre with all
  the appurtennances there unto belonging for and
  during the term aforesaid. to have & to hold the
  heirs &
  Same to her & her ʋ asigns, provided neverless unless
  the heirs of said deceased should think it best
  her
  to sell the same for ~~thm~~ best good

Third I give and bequeath to my Daughter Emner Ball
  One Pianao (now on hand)

fourth I give and bequeath to my other three children
  Laura Smillee Francis D Sanborn & Luther D Sanbrn
  and Miot Weeks (Son in Law) the personal property
  Such as tools timber &C. at the Shop, now Occupied
  by us Mearing the Stock in trade Mearing Said
  Weeks to have ~~half~~ as much as each of the others

Fifth I give and bequeath, to Ellery Johnson my Grand
  child my Silver Watch

Lastly, I give and bequeath & devise to my beloved
Wife Naomi Sanborn the Residue & remainder
    Estate
of Real ʋ or person¦ property mixed or wherever fouₙd
    as
Such ʋ Notes accounts &or Money after paying
~~payies~~ all my Just debts funeral charges &C
and do appoint M. L Goold my Sol Excutor
of this my last will & testament hereby revoking
all former wills by me made

In witness whare of I have herunto Set my hand
And Seal this 2ᵈ day of December A D, 1870

David, Page, Sanborn [L. s.]

*Bingham, Mitchells & Batchellor*, for the plaintiff.

*E. C. Stevens* and *Bingham & Aldrich*, for the defendants.

DOE, C. J.   By a will made since the repeal of the rule in *Shelley's Case*, the plaintiff's husband devised to her "for and during the term of her natural life the homestead place where we now occupy in said Littleton containing about One half acre with all the appurtennances there unto belonging for and during the term aforesaid, to have and to hold the same to her and her heirs and asigns."   Without the words "and her heirs," the habendum would have been a useless form.   With those words, it has no effect unless it operates, directly or indirectly, as a devise to her heirs or to her.   And the first question is, whether the express devise of an estate for life shall be enlarged, or construed to pass any greater estate, by reason of the habendum to her heirs.   "No express devise of any estate for life  . . .  shall be enlarged, or construed to pass any greater estate, by reason of any devise to the heirs  . . .  of such person."   G. L., *c.* 193, *s. 5.*   This repeal of the rule in *Shelley's Case* removed a technical ground on which the testator's intention was formerly defeated by the word "heirs."   *Crockett* v. *Robinson*, 46 N. H. 454, 461, 462, 463.   As the express devise of a life estate to the plaintiff would not be enlarged by a devise to her heirs, it is not enlarged by the habendum to her heirs, which is, in effect, a devise, or nothing.   It is not material whether the devise to heirs is express, or implied.   In either case, it is within the statute, and does not expand the life estate of the ancestor.

"It is said to be a rule of the common law, that, without the word 'heirs,' a fee-simple in land cannot pass by deed; and that this rule is so absolute and unyielding, that, no matter how clearly the intention of the grantor to convey a fee may be stated in the deed, such intention can be of no avail without that word.  . . .

The rule is a feudal one. . . . The word 'heirs,' when first introduced into charters and feoffments, was a word of very great importance. It enlarged the right of the vassal from one held either at the will of the lord, or for his own life, to a permanent and hereditary interest. It signified an undertaking of the lord that he would accept the heir as his vassal. . . . It was, in effect, simply a stipulation for a renewal of the lease upon the same terms with the heir of the first lessee. . . . It is important . . . that the utter repugnancy and hostility of feudal institutions to ours should be fully borne in mind. . . . It was to answer one of the conditions upon which the existence of " the feudal system " depended that the rule in question was introduced. Unless the lord bound himself that the fief should go to the heir of his vassal, the heir had no rights in it on the death of his ancestor ; but the lord, being the absolute owner of the soil, might bestow the fief upon any stranger who would enter into homage and do fealty to him for the land, upon such new services as he might impose. The rule was nothing more nor less than the practice of the feudal sovereign, securing and perpetuating his grasp upon all the land, and the services of all the landholders in his realm. Its origin, purpose, and history show it to be in no way adapted to our institutions, system of government, or condition of society. . . . When the fetters which feudalism had fastened upon the tenure of lands . . . fell off, every reason on which this rule had rested fell with them." *Cole* v. *Lake Co.*, 54 N. H. 242, 279, 283, 285.

" If an estate be made to A for life, remainder to his right heirs in fee, his heirs shall take by descent : for it is an ancient rule of law, that whenever the ancestor takes an estate for life, the heir cannot by the same conveyance take an estate in fee by purchase, but only by descent. And if A dies before entry, still his heirs shall take by descent, and not by purchase : for where the heir takes anything that might have vested in the ancestor, he takes by way of descent. The ancestor, during his life, beareth in himself all his heirs ; and therefore, when once he is or might have been seized of the lands, the inheritance so limited to his heirs vests in the ancestor himself : and the word 'heirs' in this case is not esteemed a word of purchase, but a word of limitation, enuring so as to increase the estate of the ancestor from a tenacy for life to a fee-simple. And had it been otherwise, had the heir (who is uncertain till the death of the ancestor) been allowed to take as a purchaser originally nominated in the deed, as must have been the case if the remainder had been expressly limited to Matthew or Thomas by name, then, in the times of strict feudal tenure, the lord would have been defrauded, by such a limitation, of the fruits of his signiory arising from a descent to the heir." 2 Bl. Com. 242.

" Various considerations have been supposed to have concurred in producing the rule" in *Shelley's Case*, " but the judges, in *Perrin* v. *Blake*, imputed the origin of it to principles and policy deduced

from feudal tenure; and that opinion has been generally followed
in all the succeeding discussions. The feudal policy undoubtedly
favored descents as much as possible. There were feudal burdens.
which attached to the heir when he took as heir by descent, from
which he would have been exempted if he took the estate in the
character of purchaser. An estate of freehold in the ancestor at-
tracted to him the estate imported by the limitation to his heirs;
and it was deemed a fraud upon the feudal fruits and incidents of
wardship, marriage, and relief, to give the property to the ances-
tor for his life only, and yet extend the enjoyment of it to his
heirs, so as to enable them to take as purchasers, in the same man-
ner and to the same extent precisely as if they took by hereditary
succession. The policy of the law would not permit this, and it
accordingly gave the whole estate to the ancestor." 4 Kent Com.
216, 217. "The rule in *Shelley's Case* . . . will occur to the
reader as a familiar instance of an arbitrary and technical rule of
construction, the authority of which is acknowledged by the courts,
even where its application may tend to defeat the intention of the
testator." Broom Leg. Max. 428. "It is admitted to interfere, in
most cases, with the presumed, and in many others with the de-
clared, intention of the parties to the instrument to which it is ap-
plied." 4 Kent Com. 218. Similar wrong was done by substituting
a life estate for land conveyed without qualification. "I really be-
lieve that almost every case determined by this rule, as applied to a
devise of lands in a will, has defeated the real intention of the
testator." Lord *Mansfield* in *Loveacres* v. *Blight*, Cowp. 352, 355.

In *Cole* v. *Lake Co.*, 54 N. H. 242, the rule requiring heirs to be
mentioned in a conveyance by which they took nothing, was held
to be obsolete. And if the Shelley rule (which took an estate
from them) had not been repealed, it would not have survived the
restatement of the law of interpretation in *Rice* v. *Society*, 56 N. H.
191, 197–203. But law may be weaker than education and habit,
and the statute of wills may be resisted by the influence of rules
that required an unmeaning use of the word "heirs" in one case,
and destroyed its meaning in another case by conveying to a ten-
ant for life, from his heirs, the remainder devised to them. From
constructions in which "heirs" does not mean heirs, may have
arisen the contention for a variance which does not exist between
an intent that A and A's heirs shall have a piece of land, and an
intent that A's interest in it shall be a life estate.

On a gift "to Sarah Calcott . . . her executors, adminis-
trators, and assigns . . . during the term of her natural life,"
the question was whether she took an absolute interest, or only an
estate for life. *Park*, B., was strongly inclined to the opinion that
the two clauses were absolutely repugnant and irreconcilable, and
that the last must prevail. *Coleridge*, J., was of opinion that the
last clause should not prevail. "To assist the court," he says, "in
such an inquiry, a general rule has been established after some

controversy. The latter clause or phrase is to be preferred, the former rejected. And if this rule were universal and unqualified in its application, nothing could be more easy, of course, than to act on it: the fact being established . . . that the clauses or sentences were repugnant to each other, the decision would be easy, and in all cases uniform. But I think it may be taken as clearly established that this rule must not be acted on so as to clash with another paramount rule, which is, that before all things we must look for the intention of the testator as we find it expressed or clearly implied in the general tenor of the will; and when we have found that, on evidence satisfactory in kind and degree, to that we must sacrifice the inconsistent clause or words, whether standing first or last, indifferently. And this rests upon good reason; for although, when there are repugnant dispositions, and nothing leads clearly to a preference of one or rejection of the other, convenience is strongly in favor of some rule, however arbitrary, yet the foundation of this rule, as of every other established for the interpretation of wills, obviously is, that it was supposed to be the safest guide under the circumstances to the last intention of the testator. To consider it merely arbitrary would be unnecessarily to suppose an anomaly in the canons by which wills are interpreted; to make it a rule of evidence is to make it harmonize in principle with them. . . . If two intentions are expressed in the same testament inconsistent with each other, the former must be presumed to have been abandoned, and must be overruled by the latter. But where, in the same instrument, either from recitals overriding the whole, or from express provisions, it can be collected with reasonable certainty that there was no departure from the original intention, the presumption is rebutted, and the latter clause, as repugnant to a still subsisting intention, must be rejected.

" That the conflicting words occur in the same sentence, I admit has been held to be not a sufficient reason in itself for refusing to apply the rule, and properly. In a case where there is nothing to lead the mind to an opposite conclusion, not merely the convenience of a certain rule, but reason requires that it should be so; for there is evidence, slight indeed, of a change of intention, and nothing to set against it. *Doe* v. *Biggs*, 2 Taunt. 109, is an authority for this. And on the other hand, where words have been inserted in a sentence by interlineation, and therefore may be presumed to have been last written, these have been rejected, if they were clearly repugnant to the intention of the testator in the whole provision for disposing of that part of his property. *Boon* v. *Cornforth*, 2 Ves. Sen. 277, is an instance of this. But although I distinctly admit that in cases where the rule is properly to be applied at all, it will apply to inconsistent clauses in the same sentence as well as to inconsistent sentences in the same will, yet, where the question is whether it is to be applied, we shall be led more easily, and on slighter evidence, to determine in

the negative in the former case than in the latter, simply because
the principle on which the rule stands exists in less strength in
the former than in the latter case.   To suppose a variation of
intention between the penning of the former and the latter part of
the same sentence is less reasonable than between the framing of
different dispositions in the same will.   The amount of the differ-
ence may vary infinitely.   I am not upon the degree, but the prin-
ciple.

"Mr. Jarman, in his excellent work on Wills, *ch.* xv, expresses
the rule in language which I would wish to adopt.   'It is clear,'
he says, 'that words and passages in a will which are irreconcil-
able with the general context may be rejected, whatever may be
the local position which they happen to occupy; for the rule
which gives effect to the posterior of several inconsistent clauses
must not be so applied as in any degree to clash or interfere with
the doctrine which teaches us to look for the intention of a testa-
tor in the general tenor of the instrument, and to sacrifice to the
scheme of disposition so disclosed any incongruous words and
phrases which have found a place therein.' . . . Whether,
then, the rule is to be applied or not, must in every case depend
on the evidence of intention supplied by the will itself; and the
practical difference between us is as to the amount of evidence
which should be sufficient to take the case out of the rule.   The
question here being whether Sarah Calcott took an estate abso-
lute or only for life, it is conceded, I believe, that if an inten-
tion can be clearly collected from the context, either to provide
for her children generally or in some specified event . . . we
ought to retain the words, however placed, by which alone that
intention can be effectuated, and reject those which will absolutely
defeat it. . . . If from the context you can gather nothing as
to the testator's intention, I admit the technical rule must prevail.
But on what principle is it required, on the other hand, that con-
clusive evidence of intention . . . should be adduced before
the rule can be rejected ? . . . I apprehend . . . that as
the rule itself is a rule of evidence, so the considerations which
determine on its application or rejection must be cogent, but need
not be conclusive: and that it is enough to shew the general tenor
and context to be inconsistent with the latter words. . . .
From the nature of the thing, it is impossible to define with strict
mathematical accuracy the degree of cogency in the evidence
which will warrant the court in rejecting the technical rule." *Mor-
rall* v. *Sutton,* 1 Phillips 533.

In *Vaughan* v. *Buck,* Lord *Lyndhurst* says,—"The testator
appears to have been an illiterate person, and to have drawn up
the will himself.   It is diffcult to form a very confident opinion as
to the intention of the testator in an instrument so framed.   He
begins by bequeathing to his wife the whole of his property dur-
ing her natural life, and afterwards to be divided between his

surviving children, excepting two small sums for the purpose of putting out his sons as apprentices to some trade.    He then gives 100*l*. to each of his said sons, and the same sum to each of his two daughters.    His furniture, clothes, books, etc., . . . he gives to his wife. . . .    After these bequests the will proceeds thus: 'The property, my house, 21 North Street, St. Marylebone, let on lease at 48*l*. a year, 1000*l*. new 4 per cent., 1500*l*. in the 3 per cent. consols, 645*l*. in the threes reduced, and 20*l*. per annum in the long annuities, all this I give to my wife, with the residue and interest, should there be any.'    It is contended on the part of the appellant that the widow took an absolute interest in the property mentioned in this clause.    I am of the opinion that this is not the true construction of the will, and that such was not the intention of the testator.    The clause extends to the whole of the testator's property, except the small legacies which he had before given.    It comprehends not only the property which he particularly mentions, but also the residue, which is expressly named.    It is difficult to suppose that the testator, after having, a few lines before, given the whole of his property to his wife for life, should have intended by this clause to give the same property to her absolutely."    1 Phillips 75, 78, 79.

" Whether the property passes to the devisee or descends to the heir, as in a case of intestacy, must depend upon the intention of the testator, to be gathered from the will. . . .    It is always necessarily a question of intention.    No two wills probably were ever written in precisely the same language throughout. . . . And it would be very unsafe as well as unjust to expound the will of one man by the construction which a court of justice had given to that of another, merely because similar words were used in particular parts of it.    Undoubtedly there are fixed rules of law in relation to the construction of certain words and phrases in a will, which have been established by a long course of judicial decisions, and which have become landmarks of property, and cannot therefore be disturbed.    But in most of the cases in which they have been applied it is to be feared that they have not accomplished, but defeated, the testator's intentions.    They owe their origin to the principles of the feudal system, which always favored the heir at law, because it was its policy to perpetuate large estates in the same family.    And, acting upon this principle, the English courts of justice have, in some instances, placed the narrowest possible construction on the words of a will. . . .    It has not been the disposition of courts of justice in modern times to extend the application of these rigid technical rules, but rather to carry out the intention of the testator, when no fixed rule of interpretation stands in the way.    And this is, and ought to be, more especially the case in this country.    For wills here are most frequently drawn by persons unacquainted with legal phraseology, and ignorant of the meaning which the law attaches to the words they use."

*Bosley* v. *Bosley's Executrix*, 14 How. 390, 397, 398. In this state, judicial constructions in conflict with evident testamentary intentions are not regarded as landmarks of property, but as unauthorized divestments of legal title.

" Very few classes of questions are more frequent or more perplexing in the courts than the construction of wills. If rules of construction laid down by the courts of the highest character, or the authority of adjudged cases, could meet and solve these difficulties, there would remain no cause of complaint on that subject, for such is the number and variety of these opinions that every form of expression would seem to be met. Especially is this true of the question whether a vested remainder in interest is created after a particular estate, or whether the first taker has a fee simple or full ownership of the property devised. And, in point of fact, when such a question arises, the number of authorities cited by counsel, supposed to be conclusive of the case in hand, is very remarkable. Unfortunately, however, these authorities are often conflicting, or arise out of forms of expression so near alike, yet varying in such minute shades of meaning, and are decided on facts or circumstances differing in points the pertinency of which are so difficult in their application to other cases, that the mind is bewildered and in danger of being misled. To these considerations it is to be added, that of all legal instruments wills are the most inartificial, the least to be governed in their construction by the settled use of technical legal terms, the will itself being often the production of persons not only ignorant of law but of the correct use of the language in which it is written. Under this state of the science of the law as applicable to the construction of wills, it may well be doubted if any other source of enlightenment in the construction of a will is of much assistance, than the application of natural reason to the language of the instrument under the light which may be thrown upon the intent of the testator by the extrinsic circumstances surrounding its execution, and connecting the parties and the property devised with the testator and with the instrument itself." *Clarke* v. *Boorman's Executors*, 18 Wall. 493, 502, 503.

" The language of a statute is not to be construed according to technical rules unless such be the apparent meaning of the legislature. Therefore many cases, not expressly named, may be comprehended within the equity of a statute, the letter of which may be enlarged or restrained according to the true intent of the makers of the law." *Whitney* v. *Whitney*, 14 Mass. 88, 92; *Wilkinson* v. *Leland*, 2 Pet. 627, 662; *Curtis*, J., in *Richmond R. Co.* v. *Louisa R. Co.*, 13 How. 71, 86; *Oates* v. *N. Bank*, 100 U. S. 239, 244. The same rule is applied to wills. " It is apparent that the person who wrote the will was not well acquainted with the business he undertook to perform, and that no reliance is to be placed on any particular form of expression he may have seen fit to adopt.

The whole will must be taken together, and such construction be put upon it as will carry into effect the purposes the testator had in view. We must be guided not by the letter but by the spirit of the instrument." *Judge of Probate* v. *Hardy*, 3 N. H. 147, 151.

"In *Jenkins* v. *Hughes*, 8 H. L. Cas. 571, the court said words of a technical kind are not necessarily to receive a technical meaning. In *Young* v. *Robertson*, 4 Macq. H. L. Cas. 314, 325, it was said the primary duty of a court, in the interpretation of wills, is to give each word employed, if it can with propriety receive it, the natural and ordinary meaning which it has in the vocabulary of ordinary life, and not to give words employed in that vocabulary an artificial, secondary, or technical meaning. In *Hall* v. *Warren*, 9 H. L. Cas. 420, it is laid down that in construing the autograph will of an illiterate man, the meaning of technical language may be disregarded; but no word which has a clear and definite operation can be struck out. Judge Redfield, in commenting upon these cases, says they 'evince a determination not to allow technical rules of construction to overbear and break down all the better instincts and involuntary sentiments of common-sense, and the experience of mankind, even in the construction of wills, and we hail the omen with no slight gratification.' . . . We are very much inclined to doubt whether the construing of a will according to technical rules does not result quite as often in defeating as in promoting the testator's intent. In this state, the intention of the parties to a written instrument is determined, not by any technical rules of construction, but, like a question of fact, by the weight of competent evidence. No technical rules of construction applicable to all cases can be established. The intention in each case is determined by the evidence bearing on the case." *Goodale* v. *Mooney*, 60 N. H. 528, 534, 535.

> first. I order and direct my Executor hereir named
> to pay all my Just debts and funeral charges
> Soon as may be after my deceased
>
> Second I, give and bequeath to my beloved Wife ‡naemi ^Naomi
> H, Sanborn all my House hold furnetur
> also give and devise to my beloved Wife for
> and during the term of her natural life the
> homestead place where we now occupy in said
> Littleton containig about One half acre with all
> the appurtennances there unto belonging for and
> during the term aforesaid. to have & to hold the
>           heirs &
> Same to her & her ᵤ asigns, provided neverless unless
> the heirs of said deceased should think it best
>           her
> to sell the same for ~~the~~ best good
>
>   *     *     *     *     *     *     *

Lastly, I give and bequeath & devise to my beloved
Wife Naomi Sanborn the Residue & remainder
of Real ᵤ or person¹ property mixed or wherevr found
Such ᵤ Notes accounts &or Money

The second article and the residuary clause are to be read in
the light of the fact that where land is held by a tenant for life,
the remainder is an estate of which few testators have an accurate
idea. Of its legal character as a present estate, vested during the
life tenancy, there is little understanding beyond the bar. Estates
in expectancy are almost universally regarded as mere expected
estates. In common speech, the whole of a homestead at a future
day is not a " remainder " of it, and expectants who will never have
the possession, use, or income unless they outlive a life tenant, are
not " remainder-men," but " heirs." In ordinary taxation, their
right to the future enjoyment of the land is not taken into account.
Cool. Tax. 399, 411; Burr. Tax. 353; *Peirce* v. *Burroughs*, 58
N. H. 302, 304; *Morrison* v. *Manchester*, 58 N. H. 538, 557. In
popular estimation, it is much less a present ownership than a
future right of inheritance or succession. Its technical name is
not commonly known, and it is not usually called a piece of
property. And as a witness's inability to give medical testi-
mony in the language of the jury may be in proportion to his
professional learning, so an interpreter of wills may sometimes err
because he is more familiar with legal phraseology than with the
terms in which the mass of his neighbors express themselves on
legal subjects. A full and exact knowledge of both languages is
often needed in the consideration of the question whether a word
or phrase was used by the testator in the sense in which it might
be used by lawyers, or in a different sense in which it would be
used by other classes of people. By a mistake in weighing the
evidence on this question, the will may be altered as much as by
any other error of construction. The legislature have not made
the effect of a devise depend upon the legal education of the de-
visor or his scrivener. And a judicial practice of giving every
word a technical or recondite meaning if it is ever capable of it,
would frequently violate the testator's right to use what idiom he
pleased, and to use it in his own sense.

The homestead being devised to Mrs. Sanborn for life in terms
capable of but one meaning, the ambiguous habendum (" to have
and to hold the same to her and her heirs ") naturally relates, not
to her estate, but to the land. In its literal sense, in which it ex-
presses the prevailing notion of the estate in expectancy, it means,
not that she alone, but that she " and her heirs," shall have the
whole title. As her interest is defined with absolute certainty,
the interest of " her heirs," being necessarily what is left after
deducting her life estate, needs no special description. Had an

expert been employed to write the will, Mr. Sanborn might have been made to say, "I give and devise my homestead to my wife for life, remainder to her heirs." But as the word "remainder" in that clause, without explanation, would be obscure if not unintelligible to people in general, it is not strange that he did not use it to designate the property given to the heirs. Taken in its reasonable and popular signification, his devise of the land to his wife "for and during the term of her natural life . . . with all the appurtennances there unto belonging for and during the term aforesaid, to have and to hold the same to her and her heirs," is consistent and clear. It discloses the wishes and ideas of a man who knew nothing of the technical distinction between the habendum and the rest of the sentence, and had no name for the expectant estate of "her heirs," but thought he left the nature and extent of their right in no doubt when he declared it to be his will that she and they should have the land, and that her share should be a life estate. It would be understood by substantially the whole population of the state to give the land to her for life, and then to her heirs. That was Mr. Sanborn's purpose. "No man unversed in technical rules of construction can read this will without coming to this conclusion. To hold otherwise would be to suppose the testator, in drafting his will, was governed by abstruse rules of law in regard to the effect of his expressions, of which, it is probable, he never heard, and had not the slightest conception." *Giles* v. *Little*, 104 U. S. 291, 294.

No inconsistency can be deduced from his use of the words "her heirs" without attributing to him a knowledge of feudal doctrine of which he was manifestly ignorant, and assuming, without proof and against all probability, that he used them in an erudite sense in order to contradict his explicit and repeated description of a life estate in the same sentence. The expression "for and during the term of her natural life . . . for and during the term aforesaid, to have and to hold the same to her and her heirs," is capable of two meanings. One signifies that when the plaintiff has held the land "for and during the term of her natural life," the possession, use, and income will pass to her heirs as holders of the absolute title. In this there is no discrepancy. The other describes her interest as a life estate, and also as a fee; and this factitious repugnancy the plaintiff would remove by cutting out the indubitable devise of a life estate. The common law of New Hampshire does not allow this unnecessary violence, and the statutory repeal of the Shelley rule cannot be evaded by choosing the repugnant construction to be cured by a mutilation of the will. "The law requires us to give effect to every word in a will, if possible." *Hall* v. *Hall*, 27 N. H. 275, 288.

The intention expressed on the paper cannot be set aside by inventing rules of construction, or applying rules invented by courts on other occasions, or by giving any word a meaning and effect

which Mr. Sanborn evidently did not understand. Under the rule expounded by Judge *Ladd* in *Rice* v. *Society*, 56 N. H. 191, 197–203, the testator's intention, proved by competent evidence, is his will. *Brown* v. *Bartlett*, 58 N. H. 511; *Kimball* v. *Lancaster*, 60 N. H. 264. It is more likely to be found in the writing signed by him as his will, and declared by him to be his will, than in judicial regulations of which not one testator in a hundred has ever heard. It is more intelligently sought when the interpreter knows he is weighing evidence on a question of fact than when he supposes the subject of his investigation is law in the strict sense. In one sense, the intention, like the meaning of a written contract, statute, or constitution, is a matter of law: it is a question for the court. In another sense, it is a matter of fact: it is to be determined by the natural weight of legal proof. *State* v. *Hayes*, 61 N. H. 264, 330. "The words used by the testator are the means we are to use to ascertain his intention." *Hall* v. *Hall*, 27 N. H. 275, 287. Difficulties of interpretation could often be avoided if arbitrary rules and technical definitions could be applied to the writing without regard to the author's understanding of its import. The law requires Mr. Sanborn's lawful purpose, ascertainable as a fact from his duly executed testament, to be carried into effect, however difficult the task of construction, and however easy it might be, with the aid of rules and definitions of which he and his scrivener had no knowledge, to give his words a definite meaning. The argument for the judicial enforcement of formulas judicially enacted is, the convenience of a mechanical method of construction, free from the fault of uncertainty. The argument against it is, the certainty with which it would frequently sacrifice the legal rights of parties to the convenience of the court. In this case, it might be claimed that the feudal test, proposed by the plaintiff, would be a labor-saving ground of decision. The objection to it is, that it would dispose of Mr. Sanborn's homestead contrary to his will, and contrary to law. In some cases, the structure of the document may show learning and skill, and a use of technical terms in a technical sense. The lack of technical information exhibited in this will is ample evidence that the word "heirs" was not used to enlarge into a fee the interest twice described as a life estate.

In the nature of things, a so called rule of testamentary construction, invented and applied by an exercise of judicial power, can be nothing more than an inference of fact as to the testator's intention. There is a natural presumption that he used words in "their usual and ordinary popular signification, unless there is something in the context or the subject-matter clearly indicating a different use;" and, construction being the ascertainment of his intention from all competent evidence, his meaning is to be collected, not from isolated passages, but from the whole instrument. *Perkins* v. *Mathes*, 49 N. H. 107, 110; *Mathes* v. *Smart*, 51 N. H.

438, 440. The inference of fact, that he meant all the parts should form a consistent and operative whole, forbids implications that would annul any clause capable of a reasonable interpretation and effect. *Dennett* v. *Dennett*, 43 N. H. 499, 501; *Gale* v. *Drake*, 51 N. H. 78, 83. " No word, or clause, or sentence is to be rejected or overlooked, if a reasonable and consistent construction can be given to them. . . . In former times, something has been made to depend upon the order of sentences, or the part of the instrument where qualifying or restrictive words were found; but the general rule is now settled, that their natural effect and weight is to be given to every part of the language used, in whatever part of the instrument it is found." *Drew* v. *Drew*, 28 N. H. 489, 494, 495.

When two words or clauses are contradictory and irreconcilable, and there is no other evidence than their relative position to indicate which the testator intended should control the other, their relative position may have some tendency to prove, that, during the time elapsing between the writing of the first and the writing of the second, he changed his mind, and that the second was intended to express the change. This evidence of a fact cannot be turned into a rule of law without an exercise of legislative power. The law prescribes the evidence from which, and the tribunal by which, the meaning of constitutions, statutes, wills, and written contracts shall be determined. An inference of fact drawn from the positions of irreconcilable provisions, or from any other proof contained in a writing, may be safely called a rule of construction, or a rule of evidence, if due care is taken to see that the dubious name does not destroy or weaken the distinction between the evidence from which the proper judicial tribunal ascertains the author's mind, and a rule of law established by legislative authority. The present case furnishes an instance of the error to be avoided. Notwithstanding the enactment that " no express devise of any estate for life . . . shall be . . . construed to pass any greater estate by reason of any devise to the heirs . . . of such person " (G. L., *c.* 193, *s.* 5), the plaintiff contends that " her heirs " must be read in a sense repugnant to " the term of her natural life," and that the second of the repugnant clauses must prevail over the first, and give her the fee. Under the application of formulas that are equivalent in this case to the Shelley rule, the express devise of a life estate to the plaintiff is construed to pass a greater estate by reason of the devise to her heirs. Rules of construction, not enacted by a legislative body, are set up against a law made by the senate and house. When the evidence was originally turned into law by the court, there was no statute with which that legislation came in collision.

After Mr. Sanborn's intention to give his wife a life estate had been twice written in the fullest and most positive manner, he could have changed his mind, and given her the whole title. The

alteration could have been made by drawing the pen across the words " for and during the term of her natural life," " for and during the term aforesaid." The obliteration might have required explanation in the probate court: but if legally proved to have been properly made, it would have been effective. Instead of striking out the limited term, he could have revoked the limitation by inserting a clause enlarging the life estate into a fee. In no way did he make that alteration. His purpose is to be found in the popular signification of his language, the repeal of the Shelley rule, the presumption that the devise of a life estate is a part of his will, and the absence of evidence rebutting that presumption. As the law regards the vocabulary of ordinary life, the repeal of the Shelley rule, the reasonable meaning and effect of every part of the will, and the reasonable and consistent operation of the whole, the devise of a life estate cannot be erased by construction.

However much or little instructed by his scrivener, Mr. Sanborn did not suppose, that, to make his wife absolute owner of his home, it was necessary to divide the title into a life estate and a remainder, and to make an express devise of the land to her " for and during the term of her natural life," and then to give her the remainder by a devise implied from a clause (" to have and to hold the same to her and her heirs and asigns ") which has no significance except what is found in " her heirs." In common parlance, the expression " for and during the term of her natural life . . . for and during the term aforesaid, to have and to hold the same to her and her heirs " contains a provision for " her heirs," and there is no evidence that this man was so addicted to technical and complicated phraseology as to sever the word " heirs " from its popular meaning as a description of persons to whom, in such a sentence, a right is given, and force upon it a feudal definition that would carry to their mother the right apparently given to them. Neither with nor without deliberation did he resort to such a definition to work out the transfer by reviving the merging rule of *Shelley's Case*, or by raising a conflict between " her heirs " and " the term of her natural life " (where ninety-nine hundredths of the community would see perfect concord), and suppressing the constructive conflict by a constructive extinguishment of the life estate. Before the devise " for and during the term of her natural life " was committed to paper, he would not have planned the insertion of " her heirs," or any other words, as a cancellation of her term. When the devise of a life estate was written, he intended the land should go, at her death, to his children, who were " her heirs." If, upon a reconsideration of the subject after that devise was written, he had changed his mind, and determined to alter the writing and give her the remainder previously intended for " her heirs," the change would not have been left to be inferred from a habendum to those heirs. In an amendatory clause, or in a new draft,

there would have been an express and unequivocal devise of the land to her. There could be no reason for his preferring this litigation, and the chance of the alteration being implied contrary to the literal and natural purport of his language, and contrary to the statute. ¡ There is no ground for a conjecture that " her heirs " was written in a sense that would make the sentence contradict itself for the purpose of giving his whole title to his wife by the devious process of an expunging rule of construction applied to the clash of a feudal dialect.

> Second I,   *  *  *  *  *  *  *  *  *  *  *  *  *
>     *  *  give and devise to my beloved Wife for
> and during the term of her natural life the
> homestead place   *  *  *  *  *  *  with all
> the appurtennances there unto belonging for and
> during the term aforesaid. to have & to hold the
>                heirs &
> Same to her & her ͜ asigns, provided neverless unless
> the heirs of said deceased should think it best
>                 her
> to sell the same for ~~the~~ best good

His heirs are here described as " the heirs of said deceased." Her heirs were her children. Her children were his children. His children were his heirs. And, upon the whole sentence, it is clear that the children were the only persons he had in mind when he called the heirs hers, and when he called them his. The claim that the word " heirs " in the habendum deprives the heirs of the property which the literal meaning gives them, is based on the difference between " heirs " and " children." But the context and the testator's family being satisfactory evidence that, in his mind, " her heirs " were his children, the distinction on which the plaintiff relies cannot be employed in the implication of a repugnant fee. If he had said " her children " instead of " her heirs," she would have taken a life estate only; and the whole sentence, taken together, makes her interest what it would have been if he had said " her children." *Ellis* v. *Bridge*, 2 Pick. 243, 247 ; *Barton* v. *Tuttle*, 62 N. H. 558 ; 2 Jar. Wills (5th Am. ed.) 614.

When the habendum was first written, " heirs " was not in it; and without that word, it did not divert from the children (as heirs of his intestate property) what was left of the homestead after taking out the life estate. For the apparent purpose of ensuring that residue to them, the words " heirs and " were interlined between " her " and " asigns." Connected as it is with the limited devise to the wife, the interpolation is a conspicuous effort to endow the children ; and the law does not convert it into an expressed intent to disinherit them. Their expectant estate is as palpable as the succession in the habendum of the great charter—" to have and to hold to them and their heirs."

The proviso (in which the testator undertook to provide for a sale of the land if his widow's welfare should ever require a change of the investment) is not in Chase's Probate Directory, *p.* 83, 2d ed., to which (as counsel agreed at the argument) the internal evidence points as the scrivener's model. A legal form was evidently copied and altered by some person not learned in the law, not conversant with feudal figures of speech, and in no way able to see how the children would be cut off by being mentioned in the habendum. A comparison of his draft and the hand-book which he probably used explains the composite character of the instrument, and throws a strong light on its meaning. The proviso seems to be due to his imperfect knowledge of the rights of life tenants and remainder-men. "The same," in the habendum, is "the same"— not her estate, but the land—which the heirs may "think it best to sell." Mrs. Sanborn is "to have and to hold" "the homestead place" "for and during the term of her natural life" "unless the heirs of said deceased should think it best to sell the same for her best good." The word "unless" is specially significant. It appropriately introduces a power of sale designed for the relief of the life tenant. Unless provision were made for a sale, there was a fear that her right would be merely "to have and to hold" the land as long as she lived. Such a fear, the average man, taking the habendum literally, would be likely to entertain if he considered the question, and thought a sale might become expedient. For a change of the investment, it was supposed a special authority might be necessary. It was well understood that the widow could not sell the land, as she could if she were devisee of the fee. But it was not well understood that there could be a sale by agreement of the widow and children; and for that reason, such a sale was authorized. If the investment is changed, the life tenant will be entitled to the income, and the fund can be held by a trustee in pursuance of the testator's scheme of a life estate. *Healey* v. *Toppan*, 45 N. H. 243, 260–265. In the present inquiry, the significance of the proviso is, that if Mr. Sanborn had understood he had already given his wife the land, he would have known that he had given her a right to sell it, and he would not have added "unless the heirs . . . should think it best to sell the same for her best good."

This clause is consistent with, and decisively sustains, the devise of a life estate. It cannot stand with a fee. In the mechanical mode of striking out the life estate, a repugnant fee, raised by inference from "her heirs," is supported by the rule that gives effect to the last of two repugnant provisions. But under that rule, the constructive devise of a fee is excluded by the subsequent proviso. A fee, brought in by a technical definition of "her heirs," would be thrown out by the technical rule. Whether Mr. Sanborn's intention, proved as a fact by competent evidence, is accepted as his will, or his language is subjected to the mechanical process without regard to his intention, the result is the same. Under

either method of construction, the conclusion is that "her heirs" is not a description of the estate given to his wife, but a designation of other donees. And between the devise to them and the residuary clause, there is no more repugnancy than between that clause and any other devise or legacy.

The testator's sanity not being contested, is to be assumed. But the life estate he gave his wife being twice specifically described, as the first part of the divided title, and a third time affirmed in the proviso, the theory that he also gave her both parts by a metaphorical use of "her heirs" is at variance not only with the soundness of his mind, but also with any degree of knowledge or ignorance that can be imputed to him. If he was not aware of the figurative meaning of "heirs," he did not know enough to adopt that meaning for the purpose of giving her the whole title. If he was aware of that meaning, he knew too much to adopt the translation that would carry confusion into the will, and throw doubt upon the testamentary capacity of a person contriving to devise a fee in a manner so fanciful and incoherent. He had a right to make an instrument that would dispose of his property according to his pleasure, to be ascertained as a fact from competent evidence. And his children, being "her heirs" and his heirs, are entitled to the succession which it is morally and legally certain that he understood the writing would give them.

*Case discharged.*

BLODGETT, J., did not sit: the others concurred.