MERRIMACK.

---

KIMBALL, *Adm'r, & a.* v. BIBLE SOCIETY *& a.*

A testator's power to dispose of a remainder expectant upon his life estate is executed by his devise of property described in his will as "my estate," when it appears from competent evidence that he used those words as a description of all the property he had power to dispose of.

Under some circumstances, what property shall be taken and administered by each of the administrators of different estates may be a question of convenience.

Under a will devising all the testator's real and personal estate to his wife " during her natural life, to be used and managed by her as she shall see fit," appointing her sole executrix, and, after bequests out of "whatever may remain of my property after her decease," giving A B one half " of the balance," and providing that the other half shall " be disposed of by my beloved wife as she shall choose," the testator's estate, increased by the income accruing after his death and remaining unexpended at his widow's death, is a single fund to be disposed of without regard to the distinction between principal and interest.

In an equity suit, brought by an executor for the construction of a will on which depends the right to property in dispute between a legatee and an heir, the claimant who does not prevail is not entitled to the payment of his taxable costs or counsel fees out of any part of the estate.

BILL IN EQUITY, by John Kimball, administrator of William Richardson, and by Albert H. Daniels, administrator of Olive T. Richardson, widow of William, to obtain the direction of the court for the performance of their duties. The defendants are the New Hampshire Bible Society, the trustees of Phillips Andover Academy, and heirs of Mr. Richardson (his nephews and nieces). Facts agreed.

Mr. Richardson died November 1, 1869, leaving a will dated March 13, 1861.

[Copy of his will.]

" FIRST, I give and bequeath unto my beloved wife, Olive T. Richardson, all my personal and real estate during her natural life, to be used and managed by her as she shall see fit. And I hereby appoint her my sole executrix of this my last Will and Testament.

"LASTLY, And whatever may remain of my property after her decease, it is my will that Five Hundred Dollars be given to Horace P. Dudley (my blind nephew), and One Hundred Dollars to William Marden, son of Richmond Marden, of Francestown, N. H., and of the balance that one half of it be given to the New Hampshire Bible Society and the other half to be disposed of by my beloved wife as she shall choose."

Mrs. Richardson died September 15, 1885, leaving a will dated January 2, 1878, with a codicil dated January 28, 1881.

[Copy of her will.]

" I, Olive T. Richardson, of Manchester, in the county of Hillsborough and state of New Hampshire, being possessed of sound mind and perfect memory, do make, publish and declare this my last Will and Testament, and herein dispose of all my worldly estate, in manner following, to wit:

"FIRST, I order and direct my executor, hereinafter named, to pay all my just debts and funeral charges, soon as may be after my decease, and erect suitable monument at my grave.

"SECOND, I give and bequeath unto my niece, Susan A. Batchelder, the sum of three hundred dollars, to be paid to her as soon as may be convenient after my decease: And I do also give and bequeath unto said Susan A. Batchelder one bedstead, and all the necessary bedding belonging to the same, and such articles of furniture as she may select, including all my crockery ware.

"THIRD, I give and bequeath unto my said executor, the sum of two hundred dollars in trust, the principal of said sum to be safely invested by him, and the interest thereof to be expended by him in taking care of the lot of land owned by myself and my late husband, William Richardson, in the Valley Cemetery in said Manchester. If the whole of the interest of said two hundred dollars is not needed in taking care of said lot of land in the judgment of my said executor, he is to pay the balance of said interest into the treasury of the city Missionary Society of said city of Manchester.

"LASTLY, I give, bequeath and devise, unto the Trustees of Phillips Academy of Andover Massachusetts, their successors in office and assigns forever, all the rest, residue and remainder of all my estate, both personal, real and mixed, wherever found and however situate to hold in trust, to themselves, their successors in office and assigns forever. The principal of said property and estate to be safely invested by said trustees and their successors, and the income and interest thereof is to be expended under their direction for the use and benefit of the Theological Seminary under their care.

"And I do hereby appoint Joseph B. Clark of said Manchester, sole executor of this my last Will and Testament, hereby revoking all former wills by me made."

By the codicil, she revoked the legacy of $300 to Susan A. Batchelder, gave to Harriet Twombley her wearing apparel, to Lucia Bennett all her glass, crockery, and China ware, and to Julia Russell her large brass clock.

[Copy of the second and fourth items of the codicil.]

"SECOND. I do hereby give and bequeath unto the Trustees of Phillips Academy of Andover Massachusetts, their successors in office and assigns, the aforesaid sum of three hundred dollars, for the same object and purpose mentioned in my said will, relative to the bequest therein made to said institution. . . .

"FOURTH. As to the rest, residue and remainder of all my household furniture, including carpets, bed and bedding. I give and bequeath the same unto the 'Manchester Women's Aid and Relief Society' of said Manchester, and I do hereby authorize my said executor to deliver to said society all of said furniture as soon as may be practicable after my decease."

Mr. Richardson's estate was appraised at $48,645.09, and Mrs. Richardson's (being substantially the same property and its proceeds) at $51,250.38. They had no property at.the time of their marriage. At the dates of her will and codicil, she had no real estate except the interest devised to her by him. In the appraisal of his estate, returned by her to the probate court, the brass clock which she afterwards bequeathed to Julia Russell was inventoried at $10 as his property. His heirs reserve the right to prove, if they can, that this clock was never his.

*Jeremiah Smith* and *D. Cross*, for the trustees of Phillips Academy. Mrs. Richardson's will is an execution of the power given her by her husband. "It must be remembered that, after all, every will is in exercise of a power, not technically, but generally. It is a power given by the legislature to a man to direct what shall become of his property after his death. It is a mere power; and indeed so much is it a power according to the English law, that there was a time when a man did not possess that power; it was given to him by statute. . . . When we speak of a ' devise,' we mean a devise which is the exercise of a power of disposition given to a man either by the act of parliament or by some person." *Freme* v. *Clement*, L. R. 18 Ch. Div. 499, 510. The fair inference from the use of general language in this will is, that the testatrix intended to execute both powers,—the one conferred by her husband as well as the one conferred by the legislature. The question is not whether a learned and acute lawyer would have spoken of the property embraced in the power conferred by an individual as "my property," but whether the great majority of mankind would be likely to include it under that description. Here is a technical legal distinction so fine that many lawyers have questioned its existence, and some judges have rejected it altogether. *Turner* v. *Durham*, 12 Lea 316; 2 Yerger 557; 7 Baxter 188; *Cole* v. *Cole*, 79 Va. 251; *Kendall* v. *Kendall*, 36 N. J. Eq. 91; *Hull* v. *Culver*, 34 Conn. 403, 404. "It is hard to distinguish between enjoyment for life with absolute power of disposition, and the absolute ownership." In the substance of Lord *Wynford's* language, we may say, It is difficult sometimes even for lawyers to know and apply the law in certain cases, and yet you are to suppose that this poor woman knew that she was only a tenant for life with a power of appointment, and that special words were necessary to execute the power. One of the most eminent modern English judges has said that " to the common apprehension of mankind" a general power " is exactly the same thing as property, and has for many purposes been treated as property." *James*, L. J., *In re Van Hagan*, 16 Ch. Div. 18, 31. So *Jessel*, M. R., said that " a general power is for almost all purposes equivalent to property." L. R. 16 Ch. Div. 32. And in another case the same judge said that " the general intention of mankind was the

reason of the Wills Act," which reverses the old doctrine, and provides that property embraced in a general power shall pass by a general devise of all the donor's property. L. R. 12 Ch. Div. 674. In a case where a testatrix, who had a power of disposal, spoke of a house embraced in the power as "my house," *Story*, J., said,—"The language is precisely that which would ordinarily be used by the donee of a power absolutely to dispose of the whole property, although without any interest in the property." *Blagge* v. *Miles*, 1 Story 426, 453. "This sum," said *Denio*, C. J., "though not her property in a technical or legal sense, differed but little from property which was absolutely hers. . . It is not singular that in attempting to dispose of it she should regard it as of the same nature as her own property." 33 N. Y. 390. "She was entitled for life to the income of all the residue of his real and personal estate ; and a moiety was given to her absolute disposal by any deed or writing, or by her will attested by two witnesses. She was not limited as to objects; and as to the mode, it was as ample a latitude as any one could have. It is a little hard to attempt to explain that it was not her estate. How could she have had it more than by the enjoyment during life, and the power of disposing to whatever person and in whatever manner she pleased, with the small addition of two witnesses ? By her will she gives all her estate and effects. It is hard to say that, using that expression, she meant to distinguish and not include this, which is as absolutely hers as any other part of her property." *Standen* v. *Standen*, 2 Ves. Jr. 589, 594.

The reasonable view to take of the words used in this case is, that the testatrix meant to give to her residuary legatees the largest interest she could give in everything she had power to dispose of. It is more reasonable to suppose that she intended that all the property which she had power to dispose of should pass under the residuary clause of her will, than that she intended to let this property go to her husband's collateral heirs as undevised estate. The idea that there must be not only an intention to dispose of the property embraced in the power, but also to dispose of it *under the power*, is utterly rejected by Sugden in his work on Powers, vol. 1, 7th ed., *p.* * 421. The learned author says,—"If the intention to pass the property can be collected, it will pass under the power, although the donee supposed that it would work by force of his interest. There is no conflict; he intends the property to pass, and thinks he has all the interest in it, whereas he really has only a power. The intention governs, and the power will support the disposition." See, also, Farwell on Powers 156. If the testatrix treated the whole of the property within the power as her own, and as part of her general estate, it will pass. She would naturally treat as one mass everything over which she had the power of disposition, including both the savings of the income and the principal over which she had full power of appointment,

in one aggregate fund. "There is no difficulty in saying that, so far as the testatrix was the owner, the gift shall take effect as a disposition by the owner of that part, and, so far as she had no right except under the power, that it shall operate to that extent as an execution of the power." A testatrix may, by the same clause, dispose of her own property and that over which she has simply a power of appointment. 10 N. J. Eq. 277, 282, 283. She may thus give all that she had power to give, either by authority or by interest.

The rule applied in *Burleigh* v. *Clough*, 52 N. H. 267, is arbitrary and technical, and has generally been productive of great injustice. "I am not sure the rule does not oblige the court to act against what probably might have been the intention nine times in ten." Lord *Eldon*, in *Nannock* v. *Horton*, 7 Ves. 392, 399. "In my own private opinion, I think the intention was to give the £100, which the testatrix had power to dispose of; but I do not conceive that I could judicially declare the power to have been executed, even if the result of an inquiry should verify the representation that is made as to the state of her property." Sir Wm. *Grant*, M. R., in *Jones* v. *Tucker*, 2 Mer. 533, 537, 538. "The question in this case arises from the distinction which has been adopted and settled in courts of equity between the power of disposing of property and the technical right of property, a distinction which has been regretted by eminent judges, and which, as Lord *Eldon* has observed, although professed to be adopted in order to further the intention of the testator, in nine cases out of ten defeats that object." Sir John *Leach*, M. R., in *Hughes* v. *Turner*, 3 Myl. & K. 666, 688. "I fear that the intention of the testatrix may be defeated by my decision." Sir C. C. *Pepys*, M. R., on rehearing *Hughes* v. *Turner*. "If we had felt ourselves at liberty to decide this case according to what we believed to be the intent of the testator, shown by such evidence as satisfies courts of justice on ordinary wills, we should not have so long delayed our judgment." *Nowell* v. *Roake*, 2 Bing. 497, 503. "I must, although almost ashamed to say it, decide against what I firmly and sincerely believe to have been the intention of the testatrix, that the power of appointment has not been exercised. I am bound, however, by the authorities; I cannot help myself, and I must so decide." Knight *Bruce*, V. C., *Davies* v. *Thorne*, 13 Jur. 383, 384.

"In reviewing the cases, it is impossible not to be struck with the number of the instances where the intention has been defeated by the rule distinguishing power from property." Sug. Powers, 8th ed. 338; 7th ed. 401. "I concur in the view that it is 'very desirable not to re-create any distinctions between property and a general power, which to the common apprehension of mankind is exactly the same thing as property, and has for many purposes been treated as property.'" *James*, L. J., *In re Van Hagan*, L. R. 16 Ch. Div. 18, 33. The doctrine formerly held by the English

courts was completely reversed, so far as general powers are con-
cerned, by the Wills Act (St. 1 Vict., *c.* 26, *s.* 27), which provides,
in substance, that in wills made after January 1, 1838, general
devises of real estate, and bequests of personal estate described in
a general manner, are to be construed as including real or personal
estate which the testator may have power to appoint to any objects
he may think proper, unless a contrary intention appears by the
will. "By this statute [referring to 1 Vict., *c.* 26, *s.* 27] all these
refined and subtle distinctions in relation to the execution of
powers are now swept away in England, and the doctrine has at
last settled down in that country to what would seem to be the
dictate of common sense, unaffected by technical niceties." *Story,*
J., in note to *Blagge* v. *Miles,* 1 Sto. 426, 458. "I feel con-
fident that we ought not to follow a rule thus condemned, and
which has been abolished in the country by whose courts it was
established." *Denio,* C. J., in *White* v. *Hicks,* 33 N. Y. 383, 407.
"We cannot refrain from expressing our extreme dissatisfaction
with this supposed condition of the law." *Burleigh* v. *Clough,* 52
N. H. 267, 281.

"The refinements and subtleties to which this distinction leads
are great and perplexing. . . the inconvenience and injustice
to which the English doctrine gave rise have been a constant sub-
ject of remark by the judges who applied it." This doctrine of
the English courts is "a rule of construction likely, in a majority
of cases, to defeat the intention it is designed to ascertain and
effectuate. Seeking for the intention of the testator, the rule
of the English statute appears to us the wiser and safer rule."
*Amory* v. *Meredith,* 7 Allen 397–400. "In *Amory* v. *Meredith,*
7 Allen 397, it was held that the rule adopted by the English
courts of equity, in determining whether a general power of dis-
posing of property was executed by a general devise or bequest of
the property of the testator, was not a sound rule of construction;
that it had been found in a large majority of cases to defeat instead
of furthering the intent of the testator, to ascertain and make effect-
ual which is the chief duty of the courts in interpreting the lan-
guage of wills; and that a different rule must be applied."
*Willard* v. *Ware,* 10 Allen 263, 266, 267; *Bangs* v. *Smith,* 98
Mass. 270; *Sewall* v. *Wilmer,* 132 Mass. 131." If we were at
liberty to discard certain arbitrary rules which have been estab-
lished by the courts in England, and followed to a great extent in
this country, to ascertain the intention of the donee of a power,
and simply inquire, without reference to any rules on the subject,
what was Mrs. Campbell's intention in making this deed, but one
answer, we imagine, could be made. We might safely say, as Lord
*Winford* said in the House of Lords when the *Roak* cases were
before it (1 Dow & Clark 451), that nine hundred and ninety-nine
persons out of a thousand would say, on reading the deed, that the
grantor did intend to convey a fee simple. We might go further,

and say that the remaining one of the one thousand would come to the same conclusion. And it might be further observed, that Lord *Winford's* suggestion that the rules were bad rules, was recognized by the British parliament, and some of them were abolished by 1 Vict., *c.* 26, *s.* 27." 64 Mo. 81, 82.

"The early English cases on this subject established a rule which so frequently operated to defeat the intention of grantors and testators as to require a decided departure from it, accompanied with frequent criticisms of its unsoundness by the most learned judges. . . . The strictness of this rule . . . has been repudiated by the modern cases, and there is now everywhere manifested by the courts a growing disposition to adopt a principle more liberal to the execution of such powers, and more just and certain in the ascertainment of the supposed intention relating to their execution." *Gindrat* v. *Company*, 82 Ala. 596. For other authorities, illustrating the tendency to depart from the old English doctrine, see *Warner* v. *Company*, 109 U. S. 357, 366–368; *Funk* v. *Eggleston*, 92 Ill. 515—*S. C.*, 34 Am. Rep. 136; Bigelow's note, 2 Sto. Eq. (13th ed.) *s.* 1062, *a* (*n. a*) ; Holmes's note, 4 Kent Com. (12th ed.) 335 (*n.* 1); *White* v. *Hicks*, 33 N. Y. 383.

*E. A. & C. B. Hibbard*, for heirs of Mr. Richardson. Where a power is given which may be exercised by will, it will not be executed unless there is a reference in the will to the power or to the subject of it; or unless the will would be inoperative without the aid of the power, and the intention to execute it became clear and manifest. *Burleigh* v. *Clough*, 52 N. H. 267; 2 Jarm. Wills (N. J. ed.) 272, *n.* 5—2d Am. ed., vol. 1, *p.* 543 [628]; *Foos* v. *Scarf*, 55 Md. 301; *Bingham's Appeal*, 64 Pa. St. 345; *In re Phila. T. Co.*, 13 Phila. 44; *Meeker* v. *Breintnall*, 38 N. J. Eq. 345. The residuary clause, under which the trustees claim, is in every respect what it would have been if the testatrix had had no power of disposition over property not her own. It contains nothing, neither does the will or the codicil contain anything, from which it might be known or even suspected that the testatrix had attempted to exercise a power of disposition over property belonging to another. According to all known rules of interpretation, it was her estate, and only hers, that was given to the trustees, and it is only by forcing the language of her will beyond its natural meaning, only by treating it as containing words which are nowhere to be found in it, only by supposing that she meant something she did not say, only by imagining that she intended to dispose of her husband's property contrary to her express statement that it was her property, that the construction contended for on behalf of the trustees can be put upon it. The mode of exercising a power of appointment obvious to a lawyer—also to a person of common understanding who is not a lawyer—is, to refer to

the power or to the property subject to it, in plain language, or at least in some kind of language.

" It is a general rule, that, in the execution of a power, the donee of the power must clearly show that he means to execute it, either by a reference to the power or to the subject-matter of it; for if he leaves it uncertain whether the act is done in execution of the power or not, it will not be construed to be an execution of the power." 2 Sto. Eq., s. 1062 a.  1 Sug. Pow. (3d Am. ed., 7th London ed.) 404, n. [*356].  " Three classes of cases have been held to be sufficient demonstrations of an intention to execute a power: 1. Where there has been some reference to the power in the instrument of execution.  2. Where there has been a reference to the property, which was the subject on which it was to be executed.  3. Where the instrument of execution would have no operation whatever, except as an execution of the power. . . . Where, however, the power is not referred to, the property comprised in it must be mentioned, so as to manifest that the disposition was intended to operate over it ; the donee must do such an act as shows that he has in view the thing of which he has a power to dispose. . . .  It is firmly settled that a mere general devise or bequest, however unlimited in terms, will not comprehend the subject of the power unless it refer to the subject, or to the power itself, or generally to any power vested in the testator. . . . Lord *Alvanley* stated the true rule, as established by *Andrews* v. *Emmot*, to be, that to execute a power there must be a direct reference to it, or a clear reference to the subject, or something upon the face of the will, or, independent of it, some circumstance which shows the testator could not have made that disposition without having intended to comprehend the subject of the power." 1 Sug. Pow. 404, 414, 416, 418.  " If the will be made without any reference to the power, it operates as an appointment under the power, provided it cannot have operation without the power. The intent must be so clear that no other reasonable intent can be imputed to the will ; and if the will does not refer to a power, or to the subject of it, and if the words of the will may be satisfied without supposing an intention to execute the power, then, unless the intent to execute the power be clearly expressed, it is no execution of it."  4 Kent Com. 335.

" A married woman having power to appoint leaseholds and stock, by her will executed and attested as required by the power, but not referring to it, gives to her husband the whole of her property both real and personal, and whatever she might possess at her decease. Held, not to be an execution of the power." *Lovell* v. *Knight*, 3 Sim. 276.  " Though to effect the execution of a power by will a direct reference to the power is not necessary, the intention must distinctly point to the subject of it, as if something is included which the testator had not otherwise than under the power, and part of the will unless applied to it would be

wholly inoperative." *Bennett* v. *Aburrow*, 8 Ves. 609. "It is a settled rule, that no terms, however comprehensive, in a will, although sufficient to pass every other species of°property real and personal, will execute a power, unless they demonstrate that the testator had the power in contemplation, and intended by his will to execute it. . . . . . But no general devise or bequest of all a testator's property real and personal, nor a general residuary clause, of themselves are a sufficient [execution of a] power of appointment." *Pepper's Will*, 1 Pars. S. Eq. Cas. 436. "A testator gave a fund to Z in trust, the income to be paid to the testator's widow during her life, and on her decease the whole fund to go to Z if he should survive the widow, and if he should not, to such person as he by his last will should appoint. The will then gave all the residue of the property to Z. Z died before the testator's widow, leaving a will which gave his property to his son, but in no other manner making any appointment. Held, that the will of Z was not an execution of the power of appointment." *Johnson* v. *Stanton*, 30 Conn. 297. "To constitute the execution of a power of appointment by will, there must be a reference to the power itself or to the subject of it, unless the intention is manifest from the fact that the will would remain inoperative without the aid of the power, or is so clearly demonstrated that the transaction is not fairly susceptible of any other interpretation." *Hollister* v. *Shaw*, 46 Conn. 248.

"I agree that the intention to execute the power must be apparent and clear, so that the transaction is not fairly susceptible of any other interpretation. If it is doubtful, under all the circumstances, then that doubt will prevent it from being deemed an execution of the power." *Story*, J., in *Blagge* v. *Miles*, 1 Sto. 426, 446. "While the rigid rule of construction before referred to may have, in some instances, run counter to the actual intention, which sometimes happens in the application of other rules to the construction of wills, we do not appreciate the objection to the full extent urged. Upon such a subject it is necessary to have rules : otherwise we should be absolutely at sea. The execution of a power is not an ordinary matter, but is out of the usual course of things. It is incumbent on the donee of the power to do the act ; if not done, certain consequences of importance follow; and it would seem to be in accordance with the analogies of the law, that those who claim under the appointment should be held to show satisfactorily that it was made. In a large majority of cases testators dispose only of their own estate. These wills, which embrace also the execution of powers, are exceptions to the rule. When, therefore, a testator having property leaves a will, disposing of it in the usual manner, without any reference to a power, the inference, in the absence of other proof, is that the will is not one of the exceptions, but, as it purports, disposes only of the estate proper of the testator. If the will were extended to refer

to and accomplish a matter so remarkable as the execution of a power, the part intended to make the appointment would naturally be separate and distinct from the other parts." *McGowan*, J., in *Bilderback* v. *Boyce*, 14 S. C. 528.

Doe, C. J.  By his will Mr. Richardson gave his wife all his " personal and real estate during her natural life, to be used and managed by her as she shall see fit."   Out of " whatever may remain of my property after her decease," he gave two legacies. " Of the balance " he gave one half to the New Hampshire Bible Society, and left " the other half to be disposed of by my beloved wife as she shall choose."   The question is, whether her power to dispose of " the other half " was executed in her will made nine years after his death.   After certain bequests, she gives to the trustees of Phillips academy, of Andover, Massachusetts, for the use of the theological seminary under their care, " all the rest, residue, and remainder of all my estate."   Does the competent evidence show that she understood " all my estate " included all that her husband left " to be disposed of by my beloved wife as she shall choose " ?   Did she mean to exercise all her disposing power ? There is no occasion to inquire whether her will contains an express or distinct reference to a remainder expectant upon the termination of a life estate, or to a power of appointment, or whether she had in mind, and intended to exercise, a power technically distinguished from the right of an absolute proprietor to dispose of his property by will.   Such an inquiry cannot be substituted for the question whether her will is an expression of a purpose to exercise all the right she had of determining who should be proprietors after her decease.

All, or nearly all, the property in which she had any interest during the sixteen years of her widowhood was the estate and the proceeds of the estate left by her husband.   During that time, being tenant for life of the whole, and sole executrix, she used and managed the whole as if it were hers.   It does not appear that she was so familiar with legal views of her husband's will as to understand the difference between a fee, and her rights of holding, using, and managing property as she saw fit during her life and deciding who should have it afterwards.   A legal presumption so contrary to the fact as that which, for some purposes, imputes to everybody full knowledge of the law, has no tendency to show that as a matter of fact the testatrix used the words " my estate " in a strict sense, intending to exclude the property over which she had a testator's power, and in which her rights of use were more than those of an ordinary tenant for life.   That property was hers for all the purposes for which she seems to have wanted it.   It was hers to such an extent and in such a practical sense that she would be likely to regard it as hers and to call it hers.   Naturally, and in accordance with the common use of language, she would

speak and write of lands and goods as hers which were hers during her natural life, to be used and managed as she saw fit, and the inheritance of which was subject to her unlimited control. Even if she had ever maintained or recognized a distinction between those possessions that would go from her to her heirs without a will, and those that were hers for enjoyment and disposal, it would not necessarily follow that by "all my estate" she meant only one of those classes of property. There is reason to believe, and no reason to doubt, that she exercised her testamentary powers regardless of that distinction; that her knowledge of it (if she had any) was slight and indistinct; that she did not say "all my estate" with a purpose of waiving a large part of her disposing right; and that she used those words in no narrow or technical, but in their comprehensive and popular, sense.

"An estate for life with an unqualified power of appointing the inheritance comprehends everything. . . . How can the court say that it is only by will that she can appoint? By her interest she can convey her life estate. By this unlimited power she can appoint the inheritance. The whole equitable fee is thus subject to her present disposition." *Barford* v. *Street*, 16 Ves. 135, 139; *Johnson* v. *Cushing*, 15 N. H. 298. It is probable that Mrs. Richardson labored under some misapprehension as to the extent of her title and the legal character of her appointing power over what was not strictly and absolutely hers, and that the scrivener did not take time to inform himself on these subjects. The inference from the will is, that she did not understand it to be necessary or useful to distinguish between an estate of remainder and an unlimited power over such an estate, or between property that would go to her heirs if she did not otherwise direct, and property that would go to them on her order.

If the will were construed upon a presumption that she was learned in the law, there would be a difficulty in inferring that she was ignorant of her legal position, or was satisfied with her bequest of "all my estate" as an expression of a resolution to abstain from the exercise of a large part of her testamentary power. Her proprietary interest, her actual and rightful possession, use, and management, and her right of appointing legatees are competent evidence of the sense in which she used the words "my estate" in the residuary clause. Upon this, and all the competent evidence in the case, and the evidence offered by her husband's heirs, it is more probable than otherwise that she intended to exercise her entire testamentary authority, of whatever legal nature or natures it might be. And her intention is not defeated by the rule of construction, the general operation of which was regarded in *Burleigh* v. *Clough*, 52 N. H. 267, 281, with extreme dissatisfaction. Her intention, proved by competent evidence, is her will. *Amory* v. *Meredith*, 7 Allen 397, 398; *Rice* v. *Society*, 56 N. H. 191, 197–203; *Sanborn* v. *Sanborn*, 62 N. H. 631, 643;

*Kennard* v. *Kennard,* 63 N. H. 303, 310.  Her bequest to the seminary was an exercise of the disposing power given by her husband as well as that derived from the statute.

In her management of the whole property as one estate, the principal and income were mingled by investment without any observance of the difference between a life estate and a remainder. Daniels, her administrator, and Kimball, the administrator of her husband, join in asking what property each shall administer. Under the circumstances, this seems to be a question of convenience.  Notes payable to Mr. Richardson, and now held by his administrator, may be conveniently collected by the holder.  No reason appears why Daniels should not take and account for personal property standing in the name of Mrs. Richardson, and pay Kimball what he needs for the expenses of his administration, and for the legacies given by Mr. Richardson to Dudley, Marden, and the Bible Society.  The administrators will, of course, act in concert, with full knowledge and approval of each other's proceedings, and upon consultation with the parties in interest.

CLARK, J., did not sit: the others concurred.

After the announcement of the foregoing decision, the question was presented whether the income of Mr. Richardson's estate, accruing after his death and not expended by his widow, passed by her will as her property, or whether it is a part of the estate described in his will as " whatever may remain of my property after her decease."

*Jeremiah Smith* and *D. Cross,* for the trustees of Phillips Academy.

*Chase & Streeter,* for the New Hampshire Bible Society.

DOE, C. J.  A devise of property " to A for (or during) his life " is the common legal form of a gift of a life estate.  And its ordinary technical meaning is, that the income is A's property, and if mingled with the principal during his life, is to be severed after his death for delivery to his heirs or legatees.  But there may be a qualified life estate as well as a qualified fee ; and legal terms are not always understood by testators in a technical sense.  However clear the intention that the life tenant may have all the income if he needs it, or may use or alienate it if he chooses to do so, slight evidence may be enough to prove an intention that so much of it as he neither spends nor conveys shall be considered a part of the property of which it is the unexpended increase.  Even in the absence of modifying phrases, it is by no means certain that all testators understand that such increase will go to the heirs or

legatees of the tenant for life. Enlarging or abridging terms, used in connection with the usual description of the life estate, are to be duly weighed as evidence of the kind and degree of qualification intended by the testator.

The language of Mr. Richardson's will is, " I give and bequeath unto my beloved wife, Olive T. Richardson, all my personal and real estate during her natural life, to be used and managed by her as she shall see fit. And I hereby appoint her my sole executrix. . . . And whatever may remain of my property after her decease, it is my will that $500 be given to Horace P. Dudley (my blind nephew), and $100 to William Marden . . . and of the balance that one half of it be given to the New Hampshire Bible Society and the other half to be disposed of by my beloved wife as she shall choose." While her interest as devisee was a life estate in a certain sense, it was in some respects more, and in other respects less, than a technical tenancy for life. For her necessary support (if for no other purpose) she could use the principal, if the income was not sufficient. Of whatever might remain of his property after her decease, less $600, she could devise one half to her heirs; but none of that balance was to go to them as her intestate property. The direction that his whole estate is " to be used and managed by her as she shall see fit," and the provision in relation to " whatever may remain of my property after her decease," show a purpose to maintain the unity of his estate during her life to such an extent that what remained at her decease (whether more or less than the amount left by him) should be disposed of without regard to the distinction between principal and income. She did not consume all the income, and no question was raised in her lifetime as to the limits of her rightful expenditure. What now remains of her husband's property and its increase accruing under her use and management is a single fund, out of which are to be paid debts, expenses, and his bequests to Dudley and Marden. Of the balance, one half goes by his will to the Bible Society, and the other half according to the terms of her will.

CLARK, J., did not sit: the others concurred.

A motion was made by heirs of Mr. Richardson for their costs, taxed as between solicitor and client, to be paid out of the fund.

*E. A. & C. B. Hibbard* and *G. N. Eastman*, for heirs of Mr. Richardson. The plaintiffs, as administrators *de bonis non* with the will annexed, one of William Richardson and the other of Olive T. Richardson, commenced this action and made the heirs of William Richardson defendants. The plaintiffs chose the time when and the place where questions of doubt and difficulty con-

cerning the distribution of a large estate should be determined, and compelled the heirs to come before the court and establish any rights they might claim to have, or submit to an *ex parte* decision. The plaintiffs alleged that they could not " safely proceed further in the discharge of their said trusts without the advice of the court" upon the following among other questions : "To what are the said heirs-at-law of the said William Richardson entitled, if anything?" It was for the interest of all parties that that as well as other questions should be speedily answered, and it is only justice that the costs of all as between solicitor and client should be paid from the funds, as they must have been had the decision been favorable to the heirs.

" Where the testator has expressed his intention so ambiguously as to create a difficulty which makes it necessary to come to the court of chancery to give a construction to his will, or to remove the difficulty, the costs of the litigation are usually directed to be paid out of the estate ; and the general residue is the primary fund for the payment of such costs." *Smith* v. *Smith,* 4 Paige 271. " And as they were necessary parties, and did not come into this court as volunteers, it seems to be a case falling within the general rule, that where the will of the testator is so ambiguously expressed as to render it proper for the executor to take the direction of the court, the necessary costs of the litigation to settle the construction of the will should be paid out of the fund." *Walworth,* C., in *King* v. *Strong,* 9 Paige 100. " Whenever it is rendered necessary or proper, for determining the rights of parties, that the opinion of the court should be taken as to the proper construction of a will, and the necessity for such resort has been occasioned by the doubtful or ambiguous terms employed by the testator, it is proper to award the costs against the residuary fund of the estate." *Buchanan* v. *Lloyd,* 64 Md. 306.

" Reasonable costs of parties properly before the court to litigate a question as to the party entitled to receive a legacy for charitable purposes [or as to the proper disposition of a remainder under a will], where the right was doubtful, will be allowed out of the fund." *Bliss* v. *Am. Bible Society,* 2 Allen 334 ; *Abbott* v. *Bradstreet,* 3 Allen 587. " The costs of all parties in this suit, properly brought to clear up an ambiguity in the language of the will, and to enable the plaintiffs to execute their trust, must, like the ordinary expenses of administration, be borne by the residuary assets." *Gray,* J., in *Bowditch* v. *Soltyk,* 99 Mass. 136, 141. " If the ambiguity of a will renders it doubtful to which of several charities [or to which of two persons] a legacy shall be paid, the costs as between counsel and client of all parties to a bill by executors praying for instructions as to the disposition of the legacy are to be paid out of the testator's general estate." *Deane* v. *Home for Aged Colored Women,* 111 Mass. 132; *Morse* v. *Stearns,* 131 Mass. 389.

"And it is invariably held, that if in the course of a suit for the administration of an estate, a difficulty arises upon the construction of the will, the costs occasioned by such difficulty must be defrayed out of the assets, even though the difficulty has arisen from parol evidence, introduced on the part of the defendant." Dan. Ch. (1st ed.) 1571. "Where the executor or other person appointed to carry into effect the provisions of a will comes into a court of equity to obtain the direction of the court in regard to the construction of the instrument or the mode of carrying its provisions into effect, the expense of such litigation, as it respects all the parties and as between the attorney and client, is charged upon the whole estate. . . . And a charge of this character is just as much a burden upon the whole estate as any other necessary expense attending the settlement of the estate. The general rule undoubtedly is, that whenever the testator raises a doubt in regard to the meaning of his will, his general property must pay for settling it." 1 Redf. Wills (1st ed.) 493, 494, 495. "It is here [in Massachusetts] settled, in conformity with the English rule upon this and analogous subjects, that reasonable costs of all parties, as between attorney and client, will be allowed out of the fund, where such parties are properly before the court, and the questions involved are really doubtful." 2 Redf. Wills (1st ed.) 831. "Where directions are thus sought in regard to the interpretation of a will or trust, and the duty of those appointed to carry its provisions into effect, the whole expense of the litigation is thrown upon the estate, unless the petitioner discloses a frivolous case." Sch. Ex. and Ad. 473.

"By the practice of the English Chancery, where a will is so ambiguously expressed as to make it proper for the executor to take the direction of the court . . . if all proper parties are before the court, the whole costs of the suit and of all parties will be allowed out of the residuary portion of the estate." *Bell,* C. J., in *The Dublin Case,* 41 N. H. 91. In the case last cited, the parties moving for costs out of the fund were not executors asking for instructions, but the relators in an information and plaintiffs in a bill in equity, and they had "long neglected to bring a suit," and their motion might well be disallowed (as it was) without affecting the present motion. We do not know that the question came again before the court in this state until the December term, 1875, in *Rice* v. *Society,* 56 N. H. 191. The main questions were decided at the December term, but the motion for costs was continued *nisi* till the March adjourned term, 1876, when it was ordered that the motion be allowed, and at the April trial term, 1876, the following decree was entered in pursuance of the order from the law term, as appears from the clerk's files: "That said executor pay to said society, out of the residue of the estate of Arabella Rice in his hands, the sum of five hundred dollars for costs of suit taxed as between solicitor and client." In

*Bills* v. *Putnam*, at the July adjourned term, 1888, a similar motion was made and referred to the trial term, where it was allowed.    Probably costs have been allowed in other similar cases in this state.

It will probably be contended that it is only those claiming under a will which the court is asked to construe, and not heirs who claim property upon the ground that it was not disposed of by the will, that are entitled to have their costs paid out of the fund. But when an executor is in doubt as to the validity of a legacy, and calls the legatee and the heir into court for the purpose of ascertaining to whom the money shall be paid, and compels them to litigate the question, we are at a loss to perceive why the legatee, whether successful or not, should have his costs paid from the fund, and the heir, whether successful or not, should pay his own costs. On a bill in equity by an administrator for instructions whether, on a correct construction of the statute of distributions, a quarter of his intestate's estate should be divided among all the defendants or among some of them only, the costs of all parties as between solicitor and client were ordered to come out of the quarter, and not out of the whole estate. *Bigelow* v. *Morong*, 103 Mass. 287. For the purpose of the present inquiry, it is immaterial whether the costs in the case last cited were ordered to be paid from the fund in controversy, or from the whole estate. However that might be, the case would be an authority upon the point that the costs of all parties as between solicitor and client may be ordered to be paid, although neither of the contending parties claims under a will.

*D. Cross* and *Jeremiah Smith*, for the trustees, and *Chase & Streeter*, for N. H. Bible Society.    It is a general rule in actions at law, which is also followed in suits of equity, that costs are allowed only to the successful party.    To this general rule there are some exceptions, which the equities of particular cases render necessary.    The denial by a court of equity of costs to either party, and its apportionment of costs among the parties, occur as frequent exceptions; while its order to the successful party to pay the costs of his opponent would seem to be an extraordinary exception.    The Richardson heirs, who have failed in their long and costly litigation, seek to recover the expenses their ill-advised course has caused them to incur, not under the general rule regulating costs, but under a somewhat remarkable exception thereto.

On principle, we can conceive of no sound reason for such an exception in cases of this character.    This is not, properly speaking, a bill of interpleader, though in some respects it may resemble it. Redf. Wills, 492, 493.    The plaintiffs seek the judicial construction of a will.    They have a trust to perform, and are personally interested in the legal accomplishment of the testator's intention, which they are bound to carry out when it is clearly ascertained.    Hence,

in cases of doubt, executors are allowed to apply to the court for instructions as to the testator's intention, which in proper cases the court is bound to give them.    And it is given not simply for their protection, but for their assistance in the management and settlement of their trust.   Incidentally, all parties who may be interested in the estate are notified of the pendency of the bill, in order that they may be heard if they desire to; but they are not bound to appear and engage in a legal contest among themselves; they are not ordered to interplead; their non-appearance is not taken as a disclaimer, nor are the consequences of a technical default attached to it, as in a bill of interpleader.   Dan. Ch. 1568, *n.* 4.

The court is still bound to decide the question of intention on its merits, for the information and protection of the plaintiffs.   Hence, if the heirs appear, invite litigation, and suffer defeat, their misfortune is the result of their own voluntary action and want of judgment, for which others should not be held responsible, if the accomplishment of equity is the object of equitable proceedings. After having compelled the estate to resist their unfounded claims, why should they then be allowed to compel the estate to pay their expenses?   Ambiguity in the language of a will may properly be said to be the cause of the executors' application for a judicial construction, but it is not the cause of unnecessary litigation on the part of the heirs: the cause of their contention is found in their personal motives and interests.   The fault or oversight of the testator may have furnished them an opportunity to contest his will; but it did not constitute the cause of their opposition.   On a proceeding like this they are not ordered to interplead, or suffer the presumption to follow that they relinquish their claims.   Their rights are protected whether they appear or not, and the question of the testator's intention must still be adjudicated.   We submit, therefore, that if there are cases that support the claim of the heirs, they are founded on the erroneous idea that a bill like this is a bill of interpleader, and that the only option the defendants have is to litigate their claims, or waive them.   This seems to be the view taken in the Massachusetts cases cited by the heirs. *Morse* v. *Stearns*, 131 Mass. 389.

If the heirs, when defendants, are entitled to costs, though unsuccessful, why are they not entitled to the same indulgence when they are plaintiffs in a bill seeking the same object?   If the litigation is due to the fault of the testator in the one case, it is equally so in the other.   But Daniels (Ch. Pl. & Pr. 1426) says,—"If a person claims as a legatee and his bill is dismissed, he will not in general be allowed his costs out of the testator's estate, notwithstanding there is an ambiguity in the will which renders it necessary to apply to the court for its construction."   In *Brasbridge* v. *Woodroffe*, 2 Atk. 68, the next of kin brought suit against the executors for the residue, and their bill was dismissed, "but without costs, because when the next of kin are disappointed of the

residue, it is some excuse," said the court, " for their litigating the executors' right to it." That is, they were fortunate in not being obliged to pay costs, though the Richardson heirs, seeking the same object and failing, expect to recover their costs. In *Newbegin* v. *Bell*, 23 Beav. 386, there was no residuary gift, and the next of kin filed a bill for administration. The debts exhausted the residue, but there remained assets specifically bequeathed. Held, that the plaintiff must bear his own costs, but that the executor was entitled to his costs out of the specific legacies. In *Rashleigh* v. *Master*, 1 Ves. Jr. 201, 205, it was held that no costs should be given for or against a defendant heir-at-law, who set up a claim to property as undisposed of under the will and failed. When the litigation is in fact caused by the defendant's unfounded claims, as we contend it was in this case, their costs are refused. *Webb* v. *Claverden*, 2 Atk. 424; *Thompson* v. *Clive*, 11 Beav. 475; *Girard* v. *Babineau*, 18 La. An. 603; *Smith* v. *Smith*, 1 Edw. Ch. 189, 194— S. C., 4 Paige 271, 273; *Mitchell* v. *Blain*, 5 Paige 588; *Howland* v. *Green*, 108 Mass. 277. In *Wilkinson* v. *Barber*, L. R. 14 Eq. 96, Lord *Romilly*, M. R., refused to allow costs as between solicitor and client, and allowed costs only as between party and party. In 1 L. R. Appeal Cases, Scotch, 98, Lord *Cranworth* and Lord *Westbury* were evidently inclined to think that costs would not have been allowed but for the agreement of parties.

But this question has already been settled in this state against the position taken by the heirs. In *Attorney-General* v. *Dublin*, 41 N. H. 91, 94, it is said,—" The action is brought by the plaintiff for the purpose of recovering a private right to which any thought themselves entitled. They have failed to satisfy the court of the correctness of their construction of the will in question, and they consequently stand in the position of mere strangers, setting up a claim they are unable to support ;" and the court refused to allow them their costs. The same language is equally applicable to these heirs, the fact that they are not technically plaintiffs making no difference, we submit, in principle. Whether plaintiffs or defendants, they are actors, claiming a personal benefit, and insisting on it against the estate. If in *Attorney-General* v. *Dublin* the plaintiff in interest had been the defendant, and making the same claim against the estate had failed, can any one suggest a logical, legal reason why a different rule would have been applied, and why he would have been allowed to recover his costs?

These heirs knew that they were not the intended object of the testator's bounty, and they knew perfectly well who was such object; but they hoped to pick a flaw in the testator's method of disposition, and thus frustrate his intention. The cases cited by the heirs in their brief are almost all instances where the dispute was which of two persons was the one intended as the legatee. Each claimed *under* the will. Here the heirs claim *against* the will; that is, they claimed that the will made no valid disposition of the

funds in dispute, and that hence there was a partial intestacy. The rule giving unsuccessful heirs costs in cases like this is obviously unwise and contrary to public policy. Its tendency is to encourage the litigation by heirs of inequitable and unfounded claims against the estates of testators; for, having nothing to lose and everything to gain, they would most certainly take the chances of success. Encouragement in this direction is not needed, and the precedent should not be established.

DOE, C. J. Mr. Richardson devised property "to be disposed of by" his wife as she should choose, and she made the seminary her residuary legatee. The seminary contended that her will was an execution of her power of disposal. The heirs of her husband contended that her will was not an execution of the power, and that the property, as his intestate estate, went to them. Thereupon, by this bill, the administrators of Mr. and Mrs. Richardson asked a decision of the question of construction. For the purpose of giving the seminary and the heirs an opportunity to maintain their respective claims, and for the further purpose of obtaining a decision by which the claimants would be bound, they were joined as defendants. In the litigation that followed between the seminary and the heirs, the seminary prevailed. It was decided that Mrs. Richardson's will was an execution of the power, and that the property in controversy belonged to the seminary. The heirs now move that the fees of their counsel be paid by the plaintiffs. "Costs shall follow the event of every action or petition, unless otherwise directed by law or by the court. In all actions or petitions in the supreme court, costs may, on motion and good cause shown, be limited, allowed, and such security therefor ordered, as the court may deem just." G. L., c. 233, ss. 1, 2.

In compelling the claimants to submit to a decision of the question of construction, the plaintiffs performed a fiduciary duty. They were bound to settle the estates speedily, and not to wait for legal proceedings to be instituted by others. But they were not one of the contending parties, and the result was a matter of indifference to them. They have no beneficial interest in the property, and can gain nothing and lose nothing by an order granting or denying the heirs' motion for costs. The seminary was the only legatee that had any interest in the litigation with the heirs, and the only one that took any part in it. The other legatees might as well be required to pay a part of the taxable and non-taxable costs of the seminary, as to contribute to the indemnification of the heirs; and there is no more reason for taking their property to defray the expenses of either party, than for applying it to the payment of counsel fees on both sides of every other case on the docket.

A part of the property claimed by the seminary on one side and by the heirs on the other was realty, and a part was person-

alty.   The realty vested in the seminary at the moment of Mrs. Richardson's death.   Of the personalty, the equitable title (including the whole beneficial interest) passed to the seminary at the same time.   On the question now presented, the legal, provisional title of the administrators is irrelevant.   They are mere temporary, disinterested trustees, holding the personalty for the claimant to whom it has been found to belong.   While the equitable title was in controversy, the personalty remained in the custody of the law, not for distribution among all claimants, or for any other misappropriation or waste, but for safe keeping and delivery to the equitable owner when it should be determined who the equitable owner was.   The seminary's titles, legal and equitable, were not divested, impaired, or suspended by being unsuccessfully disputed.   It being now ascertained that the seminary is and was the legal owner of the realty and the equitable owner of the personalty, and the question being whether the court shall or can convey a part of the seminary's adjudicated and indisputable title to the defeated claimants, it is not material whether the property is money, or a chattel specifically bequeathed, or a farm specifically devised, by Mr. Richardson to his wife's appointee, or whether the ownership of it, which vested in the seminary at the termination of Mrs. Richardson's life estate, was equitable only, or equitable and legal.

As corporate property may become insecure under an inadequate conception of the fact that its owners are bodies of natural persons, so the safeguards of property committed to the care of executors and administrators, and called the estates of deceased persons, may be affected by a vague notion that funds so held in trust during the process of administration do not belong to certain living heirs or legatees in the full equitable sense in which a workman's wages are his, or that the equitable title is less sacred than the legal title of other property in the possession of its absolute owners.   Mr. Richardson's heirs, having done nothing either to save this fund for the owner, or to enable the owner to get it, but having merely done what they legally and properly could to get it from the owner, are entitled to no salvage out of it, and have no lien upon it for services performed in the prosecution of their invalid claim.   The seminary's legacy in the administrators' hands is no more liable, in any legal sense, to be applied in payment of the heirs' expenses, than any other property of the seminary liable to be taken on execution.   If the heirs' motion were granted, it would be, not because they are entitled to a portion of the seminary's legacy, but because, for taxable and non-taxable costs, they are entitled to a judgment against the seminary.   It is true that an able presentation of each side of every case is a desirable mode of obtaining a correct decision.   But this advantage does not justify either an exception in this particular class of cases, or a general rule that, as to counsel fees, the losing party shall prevail.

A motion that the court convey A's property to B without A's consent can be granted only in pursuance of a constitutional law authorizing the conveyance. Upon these heirs rests the burden of showing the legality and justice of taking property from the seminary whose title is established by a final and conclusive judgment, and transferring it to the persons whose want of title is settled by the same judgment. It is not enough that such a practice prevails in other jurisdictions, American and foreign. It is necessary to produce New Hampshire authority consistent with those rights of property which are regarded here as fundamental. The legislature may leave upon each party the expense of maintaining his claim. They may allow the recovery of costs as a reparation of incidental damage suffered by the prevailing party, or as an application of some other sound theory of legal justice. At common law, a necessary expense of protecting or managing a trust fund, whether incurred by the trustee or by the beneficiary, may be charged upon the fund. *Burke* v. *Concord Railroad*, 62 N. H. 531. But the costs of the heirs in this case cannot be paid out of the seminary's property, unless, by a general rule, the prevailing party should bear the expense of an attack upon his title, or a sufficient legal reason is given for making cases of this class an exception to the contrary rule.

It is not material whether the question of construction arose upon a will, or upon a document of some other kind. In the legal character of an ambiguous will, deed, lease, note, statute, constitution, or other writing, there is nothing that requires the party prevailing on the question of its meaning to pay his adversary's counsel. If Mrs. Richardson had done by deed what she did by will, and the seminary had brought a writ of entry against the heirs, it would be held on her deed, as it was held on her will, that she intended to exercise all her right of disposal, and that the writing was an execution of her power of appointment. The seminary would recover judgment and a writ of possession for the land, and an execution for costs. The heirs would not be volunteers in the suit. They could complain, as they do now, that they were compelled to go into court and urge their view of the case, or submit to an *ex parte* decision; but the complaint would be unavailing in the absence of a valid law giving costs to involuntary litigants. No greater injustice would be done by rendering a judgment in that action against the plaintiff for the defendants' counsel fees, and satisfying the judgment by setting off to them on execution a part of the land given to the plaintiff by the Richardsons, than in ordering these administrators to pay the heirs' counsel out of the seminary's legacy. Between the two cases there is no distinction of law or fact that affects the merits of the present motion. If the seminary had been content to allow its legacy to remain in the plaintiffs' hands, and the plaintiffs had been content to hold it until the heirs brought an action to try the question of title, their

motion for costs would have been denied.  A legatee is entitled to the whole of his legacy when his title has been unsuccessfully disputed in a suit brought by other claimants.  *The Dublin Case*, 41 N. H. 91, 94.  And the question whether he is entitled to the whole of his property, or whether a defeated claimant is entitled to a part of it, does not depend on the time or place chosen for a determination of the controversy, or on the circumstances that induced one person rather than another to exercise the right of bringing the question of title into court for decision.

It is not material that the construction of Mrs. Richardson's will was a debatable question which both parties, acting upon the best legal advice, had good reason to litigate.  The expenses of the losing party are not cast upon his adversary by the circumstance that the claim, in the prosecution of which they were incurred, was not frivolous or vexatious.  Men do not generally go to law in the absence of all uncertainty and all difference of opinion as to their rights.  Litigation supposes a doubt entertained by somebody, or a controversy that raises a question.  And if the expenses of the losing party were payable by the other in a case apparently contestable on both sides, it could make no difference whether the litigated question was one of legal construction, sanity, identity, value, quantity, quality, or any other of the innumerable issues of law and fact that are tried and decided by referees, jurors, or other judges.  Between a doubt concerning the meaning of a will or other writing, and an equal doubt on any other subject, no line can be drawn on which the court can legally assume to indemnify the losing party out of his opponent's property in one class of cases, and not in all cases that are properly contested.  Whatever degree of uncertainty might be selected as the test, legal principle would demand consistency and uniformity in its application.  If the court should undertake to say when a question is doubtful enough to require the prevailing party to make the other whole in the matter of costs, the same test would be applicable to all forms of action and all kinds of controversies.  To single out a particular class of cases without legal cause, and say, in this class we will convey property from its owner to some other person, would be an assertion of arbitrary power at variance with our system of government.

"It is a general principle that a trust estate must bear the expenses of its administration.  It is also established by sufficient authority, that where one of many parties, having a common interest in a trust fund, at his own expense takes proper proceedings to save it from destruction and to restore it to the purposes of the trust, he is entitled to reimbursement, either out of the fund itself, or by proportional contribution from those who accept the benefit of his efforts."  *Trustees* v. *Greenough*, 105 U. S. 527, 532, 533. "While I agree to the decree of the court in this case, I do not agree to the opinion, so far as it is an argument in favor of a prin-

ciple on which is founded the grossest judicial abuse of the present day,—namely, the absorption of a property or a fund which comes into the control of a court, by making allowances for attorneys' fees and other expenses, pending the litigation, payable out of the common fund, when it may be finally decided that the party who employed the attorney, or incurred the costs, never had any interest in the property or fund in litigation. This system of paying from a man's property those engaged in the effort to wrest it from him can never receive my approval." *Miller*, J., *p.* 538.

The origin of the abuse is apparent. An expense of saving a trust fund, or otherwise causing it to be legally administered, may be an expense of the trust, payable out of the fund, whether incurred by the trustee who holds the legal title, or by the beneficiary who holds the actual interest. It is sometimes a question whether an expense was incurred by an equitable owner in the protection of the property and the enforcement of the trust, or by a claimant of the equitable title in a contest with another claimant of the same title; and the distinction is not always accurately maintained between costs of administering the fund for the benefit of the owner, and costs of an effort to divert it to a claimant not known to be, or known not to be, the owner. " If a person claims as legatee, and his bill is dismissed, he will not be entitled to his costs out of the testator's estate, notwithstanding there is an ambiguity in the will which renders it necessary to apply to the court for its construction. . . . It does not seem to us that there is here any just ground to charge the expenses of this litigation upon the fund in controversy. The action is brought by the plaintiffs for the purpose of recovering a private right to which they thought themselves entitled. They have failed to satisfy the court of the correctness of their construction of the will in question, and they consequently stand in the position of mere strangers, setting up a claim which they are unable to support." *The Dublin Case*, 41 N. H. 91, 94.

There is no legal or equitable ground on which this case can be made an exception to the rule, that the prevailing party does not pay his adversary's taxable and non-taxable costs. The fees of the heirs' counsel were not an expense of fiduciary administration. For all purposes that are relevant on the present motion, the heirs are the losing party, and the seminary is the prevailing party, on an ordinary question of title. If the administrators should be ordered to pay the heirs' counsel out of the seminary's legacy, it would follow in all cases that the prevailing party should pay his opponent's counsel fees and other expenses, and recover nothing except what might be left of the property or damages in controversy after fully indemnifying the other side. If it had been enacted that, in cases of wills and corporations where title is contested, the court shall convey, by levy of execution or otherwise, enough of the property from the person adjudged to be the owner to the

other claimant to indemnify him for all loss, cost, and damage result-
ing from his claiming what was not his, it would have been neces-
sary to inquire how the statute could be sustained. If the seminary's
title could be considered as suspended during administration or
during litigation, an order granting the heirs' motion would be a
violation of the statute of wills (G. L., *c.* 193, *s.* 1) and the rights
of Mr. and Mrs. Richardson. A testator necessarily intends that
his property shall be subject to expenses of administration, but not
to the costs of an ineffectual attempt to defeat his will. The
diversion of any part of the Richardson estate from the destination
fixed by the testators would not be an exercise of judicial power.

*Motion denied.*

CLARK, J., did not sit : the others concurred.